*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

S. THOMAS PADGETT, Personal Representative of the ESTATE OF GLORIA JEAN TAULBEE,

        Plaintiff-Appellant,

v

AMY LYNN TAULBEE

        Defendant-Appellee.

UNPUBLISHED
December 18, 2024
2:05 PM

No. 369545
Wayne Circuit Court
LC No. 23-000633-CK

Before: N. P. HOOD, P.J., and CAMERON and LETICA, JJ.

PER CURIAM.

Plaintiff, S. Thomas Padgett, Personal Representative of the Estate of Gloria Jean Taulbee, appeals as of right the trial court order denying plaintiff's motion for summary disposition under MCR 2.116(C)(9) (failure to raise a defense) and (10) (no genuine issue of material fact) and granting summary disposition in favor of defendant, Amy Lynn Taulbee, under MCR 2.116(I)(2). We affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

In January 2023, plaintiff filed a complaint "to set aside and recover a fraudulent transfer, to recover real property, and for a judgment for the value of the fraudulent transfer." It was alleged that the decedent died on June 22, 2022. In December 2022, creditor DFCU Financial filed a petition to open the decedent's estate in Wayne County Probate Court and nominated plaintiff to serve as personal representative. Plaintiff contended that the hearing was held on December 14, 2022, and the appointment occurred on December 19, 2022.[1]

Plaintiff alleged that the decedent owned and lived in a home located at Tenny Street in Dearborn, Michigan. The home was not subject to any mortgages or liens, and its fair market

---

[1] Plaintiff states that the action is pending in Wayne County Probate Court, File No. 2022-878144-DE. This Court does not have the benefit of the probate court record.

value exceeded $150,000. On December 21, 2021, the decedent executed a quitclaim deed in which she retained a life estate in the home, but intended to transfer her ownership interest to defendant upon her death. Plaintiff claimed that, at the time of the execution of the deed, the decedent owed numerous creditors, including DFCU Financial, TD Bank, and Citibank. He alleged that the execution of the quitclaim deed by the decedent rendered her insolvent because the deed transferred substantially all of the decedent's assets. Further, there was no or inadequate consideration paid by the defendant for the transferred ownership interest in the home. That is, defendant did not pay the decedent the reasonable equivalent value of the home. Accordingly, plaintiff determined the decedent was rendered insolvent as a result of the transfer of the home to defendant. And, after the decedent died, her creditors did not receive any payments and her estate was unable to pay its administrative expenses or creditors.

Under the Michigan Uniform Voidable Transactions Act (MUVTA), MCL 566.31 *et seq.*, plaintiff alleged that defendant satisfied the definition of "insider." And, the transfer of the home rendered the decedent's estate "insolvent," as defined by the act. Accordingly, the deed and transfer of the home from the decedent to defendant constituted a voidable and fraudulent conveyance under MUVTA. In the action, plaintiff sought to set aside the deed, recover a judgment for the value of the home, and recover an award of attorney fees and costs for bringing the action.

Attached to the complaint, plaintiff submitted the quitclaim deed dated December 21, 2021. This deed provided that the decedent quitclaimed her residence "for her lifetime," but then conveyed the property to defendant, who was listed at the same residential address. The deed stated that the transfer was exempt from county transfer tax, MCL 207.50(a), exempt from state transfer tax, MCL 207.526a, and there was no consideration paid. The deed was drafted by an attorney and recorded on December 21, 2021 in Wayne County's Register of Deeds.

In July 2023, plaintiff moved for summary disposition under MCR 2.116(C)(9)[2] and (10). Plaintiff alleged the decedent executed a quitclaim deed on December 21, 2021, that transferred her residential home to herself and defendant. In the deed, the decedent retained a life estate and defendant obtained the remaining ownership interest at the decedent's death. Although the home was worth in excess of $150,000 and was not subject to any mortgages or liens, defendant failed to pay any or adequate consideration for the deed transfer. The decedent was "rendered insolvent"

---

[2] Although plaintiff cited to MCR 2.116(C)(9) ("The opposing party has failed to state a valid defense to the claim asserted against him or her."), he did not cite to any applicable caselaw or focus on this subsection. And "[o]nly the pleadings may be considered when the motion is based on subrule (C)(8) or (9)." MCR 2.116(G)(5). Yet, plaintiff relied on documentary evidence, including the quitclaim deed, a collections officer's affidavit, and plaintiff's affidavit in support of summary disposition. When "the parties and the circuit court relied on documentary evidence beyond the pleadings," we consider the motion as being granted under MCR 2.116(C)(10) and examine the pleadings and documentary evidence. *Mino v Clio Sch Dist*, 255 Mich App 60, 63 n 2; 661 NW2d 586 (2003). Because this case cannot merely be resolved on the pleadings alone and consideration of the documentary evidence is necessary, it will be examined under the (C)(10) standard.

as a result of the quitclaim deed "transfer" of the home. Consequently, no payments were made to the decedent's creditors after her death, including DFCU Financial, Citibank, TD Bank, and others. Plaintiff alleged that, under MUVTA, defendant was an insider and the decedent's transfer of her home through a quitclaim deed constituted a voidable transfer. Because the decedent's estate was insolvent, plaintiff was authorized to seek a judgment setting aside the deed and recover the home and its value.

In September 2023, defendant filed a brief in opposition to plaintiff's motion for summary disposition. Defendant alleged that the "Lady Bird" deed executed in this case was a legal means of estate planning that allowed the decedent, as a grantor, to maintain a life estate in her property while ensuring that the property passed to defendant, a named beneficiary, on death without the need to file a probate action. Although plaintiff claimed that the deed reflected a fraudulent transfer and the decedent's attempt to avoid her creditor obligations, defendant alleged that plaintiff failed to provide any evidence of the decedent's intent. On the contrary, defendant submitted an affidavit that the decedent discussed the Lady Bird deed with defendant, that the two recorded the deed together, that the decedent's death was unexpected, that the decedent was motivated to make a standard family inheritance, and the decedent did not seek to defraud or avoid her bills. Moreover, an earlier unrelated probate court decision concluded that Lady Bird deeds were not transfers within the meaning of MUVTA, and therefore, could not be characterized as fraudulent conveyances. Because fraudulent intent on the decedent's part was lacking and the caselaw was inapposite or distinguishable, defendant asked the court to deny plaintiff's motion for summary disposition.

In September 2023, plaintiff filed a reply brief, asserting that defendant's affidavit failed to refute the elements of a fraudulent claim under MUVTA or create a factual issue. Therefore, plaintiff requested summary disposition in favor of the estate.

In September 2023, the trial court heard oral argument on the motion, denied it without prejudice, and cited the need for additional discovery to address the insolvency issue. After discovery closed, plaintiff renewed the motion for summary disposition. Defendant opposed the dispositive motion through counsel, continuing to allege that her affidavit raised a genuine issue of material fact regarding the decedent's intent.

On January 19, 2024, the trial court heard oral argument on the renewed motion for summary disposition. Plaintiff alleged that he demonstrated insolvency, and therefore, judgment was proper in the estate's favor. Defendant appeared *in propria persona* and made the following statements about the decedent's health, employment, and bill payment history that plaintiff did not contradict:

> Okay. Right, so my mother got sick out of nowhere. My mother was the healthiest person I knew, she went to work every day. She paid her bills on time each month and she was not in - - She had, she owed money, but she paid her bills each month. Even when she was sick I went and paid those bills for her, so she was not insolvent to anyone at that time.
>
> And then when she passed in my mind in June 2022, you know, I just lost my mother, this was the last thing I was thinking that someone was gonna come try

to take my house from me that I've lived in 31 years of my life, and I would be homeless if this happens to go through. But this shouldn't happen because, again, she paid her bills up until the day she died, pretty much, you know.

And like I've listed multiple reasons on here, I could read it all, but I'm just like- - and this has put so much stress on me and my family and it's just been really hard. And, you know, like I didn't go to law school or anything and I can't afford a lawyer right now, but I know my mom and my mom put the ladybird in place for me so I can have somewhere to live for the rest of my life.

And my mother paid all her bills on time, she paid the minimum payment each month, I made sure that even when she got sick I would pull money out of her bank for her and I would pay those bills for her.

This has caused undue stress on me and my family me thinking that I'm gonna lose my house I've lived in my entire life, I wouldn't know what to do, you know. And my mom wasn't a bad person, she would never commit fraud. She will never commit fraud. And even if that was fraud, how did it go through? How did it, how did it become a quitclaim deed, that's what I don't understand either.

Plaintiff responded that, under these circumstances, the home recipient generally gets a mortgage and pays the debts. And, if judgment was granted in plaintiff's favor, defendant would have time to obtain a mortgage and negotiate a settlement in probate court. Defendant seemingly began to interject that she was unable to qualify for a mortgage. But, plaintiff continued, claiming that even if defendant did nothing, and plaintiff sold the house, defendant would still net $100,000 in proceeds. The trial court ruled:

[E]ven after the re-filing of this motion, I'm not convinced that the decedent became insolvent as a result of this transfer. I don't think you've satisfied your statutory burden under MCL 566.34 or 35 that the transfer is voidable and should be set aside.

I'm denying your motion, I think there's a number of issues here, especially the cases that you cite about secured debts, which I think are distinguishable from this one.

The trial judge indicated that the parties would receive a scheduling order.

But, on January 19, 2024, the trial court issued a written order granting summary disposition in favor of defendant under MCR 2.116(I)(2), stating:

Plaintiff filed his motion for summary disposition seeking to set aside an allegedly fraudulent transfer made to defendant from her mother. At the hearing on the motion, the court had denied the motion on the record for the reason that Plaintiff had not established that the transfer was voidable under MCL 566.34 or 566.35 and the court set a trial date for the rem[ai]ning i[s]sues, if any, in the case. Plaintiff sought clarification of which issues remained for trial and the court, without immediate benefit of reviewing the complaint, stated it [w]ould issue a written order

-4-

upon fu[r]ther review of the pleadings. Having reviewed the pleadings, the court orders as follows:

Plaintiff's complaint contains one count alleging fraudulent transfer under MCL 566.34 and 35. MCL 566.34(a) requires an "actual intent to hinder, delay, or defraud any creditor" when the transfer was made. Plaintiff has offered no evidentiary proof that the transfer was made with the intent to hinder, delay or defraud as Defendant [sic – the decedent] continued to pay her bills up until her death and therefore Plaintiff cannot show this circumstance existed. Likewise, Plaintiff has not provided any evidence that Defendant's mother "intended to incur, or believed or reasonably should have believed that [she] would incur debts beyond [her] ability to pay as they become due" when she made the transfer under MCL 566.34(b). Consequently, Plaintiff cannot satisfy the requirements of MCL 566.34.

Plaintiff also argues that MCL 566.35 applies, alleging no appropriate consideration was given for the transfer, however, that statute also requires that the debtor be insolvent at the time of the transfer or be made insolvent as a result of the transfer. While Plaintiff is correct that no val[u]able consideration was exchanged. Defendant continued to pay her creditors up until her unexpected and untimely death. Therefore, the deed was not made while she was insolvent and the transfer did not render her insolvent because she retained a life estate in the property that would have allowed her to sell, encumber or mortgage the property to pay her creditors.

Having reviewed the pleadings in this matter, the court finds that Plaintiff is unable to satisfy MCL 566.34 or 35. Furthermore, pursuant to MCR 2.116(I)(2), judgment is rendered in favor of the Defendant as there are no remaining issues of fact to be litigated and Defendant is entitled to judgment as a matter of law. Plaintiff's complaint is hereby dismissed. This is a final order and closes the case.

From this order, plaintiff appeals.

## II. STANDARD OF REVIEW

A trial court's decision on a motion for summary disposition is reviewed de novo. *Charter Twp of Pittsfield v Washtenaw Co Treasurer*, 338 Mich App 440, 448; 980 NW2d 119 (2021). A motion for summary disposition premised on MCR 2.116(C)(10) tests the factual sufficiency of the complaint. *Id*. at 449. The moving party must identify and support the issues to which the moving party believes there is no genuine issue of material fact, and the affidavits, pleadings, depositions, admissions, and other documentary evidence submitted with the motion must be examined. *Id*. Once the moving party makes and supports its motion, the opposing party may not rest on mere allegations or denials in the pleadings, but must submit documentary evidence setting forth specific facts to demonstrate a genuine issue for trial. *Id*. (quotation marks and citation omitted). "If it appears that summary disposition is proper in favor of the opposing party, instead of the moving party, summary disposition may be granted under MCR 2.116(I)(2)." *Aldrich v*

*Sugar Springs Prop Owners Ass'n*, 345 Mich App 181, 186; 4 NW3d 751 (2023) (citation omitted).

## III. ANALYSIS

Plaintiff contends that the trial court erred in denying his motion for summary disposition and in granting summary disposition in favor of defendant under MCR 2.116(I)(2) because the quitclaim deed rendered the decedent's estate insolvent, there was no consideration paid by defendant, and defendant was an insider under MUVTA. We disagree.

Plaintiff moved for summary disposition, contending that MCL 566.34 and MCL 566.35 demonstrated that the decedent's execution of the quitclaim deed was a voidable transfer. The following rules apply to statutory construction:

> "A decision on a motion for summary disposition and the interpretation of a statute are reviewed de novo." *ADR Consultants, LLC v Mich Land Bank Fast Track Auth*, 327 Mich App 66, 74; 932 NW2d 226 (2019). Issues involving statutory interpretation present questions of law that are reviewed de novo. *Meisner Law Group, PC v Weston Downs Condo Ass'n*, 321 Mich App 702, 714; 909 NW2d 890 (2017). "The primary goal of statutory interpretation is to give effect to the intent of the Legislature." *Briggs Tax Serv, LLC v Detroit Pub Sch*, 485 Mich 69, 76; 780 NW2d 753 (2010). The most reliable evidence of legislative intent is the plain language of the statute. *South Dearborn Environmental Improvement Ass'n, Inc v Dep't of Environmental Quality*, 502 Mich 349, 360-361; 917 NW2d 603 (2018). If the language of the statute is clear and unambiguous, it is presumed that the Legislature intended the meaning plainly expressed in the statute. *Gardner v Dep't of Treasury*, 498 Mich 1, 6; 869 NW2d 199 (2015). The court's interpretation of a statute must give effect to every word, phrase, and clause. *South Dearborn*, 502 Mich at 361. Further, an interpretation that would render any part of the statute surplusage or nugatory must be avoided. *Id.* Common words and phrases are given their plain meaning as determined by the context in which the words are used, and a dictionary may be consulted to ascertain the meaning of an undefined word or phrase. *Id.* "In construing a legislative enactment we are not at liberty to choose a construction that implements any rational purpose but, rather, must choose the construction which implements the legislative purpose perceived from the language and the context in which it is used." *Frost-Pack Distrib Co v Grand Rapids*, 399 Mich 664, 683; 252 NW2d 747 (1977). [*Le Gassick v Univ of Mich Regents*, 330 Mich App 487, 494-496; 948 NW2d 452 (2019).]

In *Dillard v Schlussel*, 308 Mich App 429, 445; 865 NW2d 648 (2014), this Court provided a summation and purpose of the Michigan Uniform Fraudulent Transfer Act, the precursor to MUVTA:

> A brief overview of fraudulent-transfer law helps place the statutory provisions in context. "The modern law of fraudulent transfers had its origin in the Statute of 13 Elizabeth, which invalidated 'covinous and fraudulent' transfers designed 'to delay, hinder or defraud creditors and others.' " *BFP v Resolution*

*Trust Corp*, 511 US 531, 540; 114 S Ct 1757; 128 L Ed 2d 556 (1994) (citation omitted). The Uniform Fraudulent Transfer Act (UFTA), promulgated by the National Conference of Commissioners on Uniform State Laws, codifies the common law. The UFTA is "designed to prevent debtors from transferring their property in bad faith before creditors can reach it." *BMG Music v Martinez*, 74 F3d 87, 89 (CA 5, 1996). The Supreme Court of Wisconsin has explained, "The Uniform Fraudulent Transfer Act reflects a strong desire to protect creditors and to allow for the smooth functioning of our credit-based society. It is a creditor-protection statute. Without such protection for creditors, '[c]reditors would generally be unwilling to assume the risk of the debtor's fraudulent transfers.' " *Badger State Bank v Taylor*, 2004 WI 128, ¶ 41; 276 Wis 2d 312; 688 NW2d 439 (2004) (citations omitted) (alteration in original). Our Legislature enacted the MUFTA in 1998.

The MUFTA defines two species of fraudulent transfers. The first encompasses transfers made "[w]ith actual intent to hinder, delay, or defraud" a creditor and applies to transfers made either before or after the creditor's claim arose. MCL 566.34(1)(a). The second, commonly called "fraud in law" or constructive fraud, deems certain transactions fraudulent regardless of the creditor's ability to prove the debtor's actual intent. It applies only to transfers made after the creditor's claim arose. Three elements of proof are required: (1) that the creditor's claim arose before the transfer, (2) the debtor was insolvent or became insolvent as a result of the transfer, and (3) the debtor did not receive "reasonably equivalent value in exchange for the transfer . . . ." MCL 566.35(1).

MUFTA was replaced by MUVTA, 552 PA 2016, effective April 10, 2017.

In *Dillard*, the plaintiff obtained a substantial judgment against the defendant, a Michigan attorney, for a failed investment in an Arizona company. An Arizona jury rendered a verdict against the defendant, and the judgment was domesticated in Oakland County. *Id*. at 433-434. After the defendant was evasive about the source of his funds to pay household expenses, a MUFTA action was filed. *Id*. at 435-437. Because a debtor's state of mind determined whether a transfer was made with actually fraudulent intent and debtors rarely admitted to the deliberate placement of assets outside a creditor's reach, English courts developed "badges of fraud." These "badges of fraud" were proofs from a creditor of certain objective facts that raised a rebuttable presumption of actual fraudulent intent. *Id*. at 448-449 (citations omitted). The "badges of fraud" were not necessarily conclusive but could overcome evidence establishing a bona fide transaction. See *Bentley v Caille*, 289 Mich 74, 78; 286 NW 163 (1939).

The *Dillard* Court continued by noting that the nonexclusive list of facts in MCL 566.34(2) were examined to determine a debtor's actual intent in making a transfer. *Dillard*, 308 Mich App at 449-450. After examining the factors, it was determined that eight of the 11 factors gave rise to an inference of actual intent to defraud because the defendant made most of the transfers when his financial situation was "precarious at best and dreadful at worst." *Id*. at 453.

We conclude that MUVTA and its factors are the appropriate manner to determine the decedent's intent in the present case. As already discussed, plaintiff contends that two provisions of MUVTA demonstrate that the transfer of the decedent's residential property is voidable. MCL 566.34 is entitled "Transfer with intent to defraud" and provides:

(1) Except as otherwise provided in subsection (4), a transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following circumstances:

(a) With actual intent to hinder, delay, or defraud any creditor of the debtor.

(b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor did either of the following:

(*i*) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

(*ii*) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

(2) In determining actual intent under subsection (1)(a) or (4), consideration may be given, among other factors, to whether 1 or more of the following occurred:

(a) The transfer or obligation was to an insider.

(b) The debtor retained possession or control of the property transferred after the transfer.

(c) The transfer or obligation was disclosed or concealed.

(d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(e) The transfer was of substantially all of the debtor's assets.

(f) The debtor absconded.

(g) The debtor removed or concealed assets.

(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred.

(k) The debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

(3) Except as otherwise provided in subsection (4), a creditor that makes a claim for relief under subsection (1) has the burden of proving the elements of the claim for relief by a preponderance of the evidence.

(4) A qualified disposition is fraudulent as to the creditor whose claim arose after the qualified disposition only if the qualified disposition was made with actual intent to hinder, delay, or defraud any creditor of the debtor. With respect to a qualified disposition, a creditor has the burden of proving the elements of the claim for relief by clear and convincing evidence.

MCL 566.31(f) defines "debtor" as "a person that is liable on a claim." Thus, it must be ascertained whether the decedent, as a debtor, made a transfer with the actual intent to hinder, delay, or defraud any of her creditors. MCL 566.34(1)(a). MCL 566.31 defines "transfer":

(s) "Transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset. Transfer includes payment of money, release, lease, license, and creation of a lien or other encumbrance. Transfer does not include any of the following:

(*i*) The lapse, release, waiver, or disclaimer of a power of appointment given to a donee by a third party. As used in this subparagraph, "donee" means that term as defined in section 2 of the powers of appointment act of 1967, 1967 PA 224, MCL 556.112.

(*ii*) The disposing of or parting with an asset or interest in an asset held in trust to the person who created the trust if all of the following apply:

(A) The trust is an irrevocable trust for the benefit of third parties.

(B) The trust is a grantor trust with regard to the person for income tax purposes under sections 671 to 679 of the internal revenue code of 1986, 26 USC 671 to 679.

(C) The trustee has the discretionary authority to reimburse or advance trust property to the person for taxes that concern income attributable to the trust property.

(D) The disposing of or parting with the asset or interest in the asset is the exercise by the trustee of the discretionary authority described in sub-subparagraph (C).

To determine actual intent under MCL 566.34(1)(a), MCL 566.34(2)(a)-(k) delineates many factors to consider as applied to the facts, and the creditor must establish the transfer is voidable by a preponderance of the evidence. MCL 566.34(3).

MCL 566.34(2)(a) addresses "[t]he transfer or obligation was to an insider." MCL 566.31(i)(*i*)(A) defines "insider" as "[a] relative of the debtor[.]" Because the decedent transferred an interest in her home to defendant, her daughter, this criteria favors finding an intent to defraud.

MCL 566.34(2)(b) states "[t]he debtor retained possession or control of the property transferred after the transfer." The parties do not dispute the transfer was achieved through a quitclaim deed that is also known as a "Lady Bird" deed. A "Lady Bird" deed has been described as:

> "A 'Lady Bird' deed is a nickname for an enhanced life estate deed. It is named after Lady Bird Johnson, because allegedly President Johnson once used this type of deed to convey some land to Lady Bird. An enhanced life estate deed is a variation of a quitclaim deed that currently enables an individual to retain their homestead creditor and tax exemption, have the home be exempt from Medicaid claims during their lifetime, while at the same time enable named persons to receive the home upon death, free of Medicaid claims and liens. It is a specially designed instrument that is only available in a few states, including Florida. Generally, it works like a traditional Life Estate Deed, and there is often no capital gains tax if the property is sold shortly after your death. It goes beyond a life estate deed, because not only does the life tenant get to live there for life, that former owner also reserves more than just a life estate. Also reserved are the rights to sell, commit waste, and almost everything else, except the transfer on death to the 'remainderman'." [See <https://definitions.uslegal.com/l/lady-bird-deed/> (accessed December 3, 2024).]

Michigan is one of the states that recognizes a Lady Bird deed and its use as an estate-planning tool to avoid probate. See *In re Estate of Rasmer*, 501 Mich 18, 44 n 18; 903 NW2d 800 (2017). The "Lady Bird" deed is a deed "that allows a property owner to transfer ownership of the property to another while retaining the right to hold and occupy the property and use it as if the transferor were still the sole owner." *Bill & Dena Brown Trust v Garcia*, 312 Mich App 684, 687 n 2; 880 NW2d 269 (2015).

A review of the Lady Bird or quitclaim deed executed here reveals that it was prepared by an attorney. It is evident from the description of a Lady Bird deed that it provides beneficial tax credits to an individual during their lifetime and allows the property to transfer to another without incurring capital gains tax at death. Thus, it also operates as an estate-planning tool. And, defendant testified that the decedent gave defendant the interest in the home without giving an interest to her half-siblings. Defendant testified that she had lived in the Tenny property her entire life, and her half-siblings were settled in their own homes. Therefore, the decedent's actions were

designed to ensure that defendant and her child continued to have a home in the event of the decedent's death, not an intent to defraud her creditors.[3]

This factor, MCL 566.34(2)(b), favors a finding of no intent to defraud. Although the decedent retained a life estate interest in the property, there is no indication that she did so to avoid any debt collection. In *In re Estate of Rasmer*, 501 Mich at 44 n 18, it was noted that a Lady Bird deed served as a means to estate plan without resorting to probate. The Lady Bird deed allowed "a property owner to transfer ownership of the property to another while retaining the right to hold and occupy the property and use it as if the transferor were still the sole owner." *Id.* (quotation marks and citation omitted). The grantor of the Lady Bird deed retained the right to sell, commit waste, and do almost anything else. *Bill & Dena Brown Trust v Garcia*, 312 Mich App at 687 n 2. Therefore, although plaintiff asserts that the execution of the deed rendered the decedent insolvent, the decedent, as the grantor, retained a life estate in the property. Further, the quitclaim deed entitled the decedent the right to sell, and therefore, essentially, terminate defendant's interest before the decedent's death. Because of the decedent's retention of her interest in her home, this factor does not favor a finding of an intent to defraud.

Additionally, defendant filed an affidavit that provided:

2. I am the daughter of [the decedent], who on or about December 21, 2021, executed a Lady Bird deed pertaining to the home located at 21725 Tenny in Dearborn, Michigan ("the Property").

3. As the sole owner of the Property, [the decedent] retained a life interest in the home via this deed. However, this action was not sudden or without precedent. For several years prior to the execution of the Lady Bird deed, [the decedent] and I had numerous discussions regarding her children's respective inheritances. Among the topics of these discussions was that the Property would be my inheritance and not my siblings. It was within the context of these conversations that she expressed her wishes concerning which family members would inherit specific assets.

* * *

6. At no point did [the decedent], indicate that her intention behind executing the Lady Bird deed was to defraud or avoid obligations to her creditors, including the

---

[3] In her deposition, defendant testified that she initially made some "small payments" to creditors, but could not afford to continue do so because she was unaware of the extent of the decedent's credit card debt until the decedent became "sick and dying." And, the decedent advised defendant that "When I die all my debt goes with me." Defendant recalled that when her father died in 2016, the decedent was not responsible for his debts. Defendant further testified that the Lady Bird deed was designed to transfer the house without probate, stating: "[The decedent] made a Lady Bird Deed. So whenever she passes, the house would automatically get transferred to me, and that's all I know about that." Defendant did not pay for the home, testifying: "[The decedent] did not request [defendant] pay her any money. So I did not."

Plaintiff. Her motivations were rooted in a longstanding desire for clear family inheritance arrangements and ensuring the future well-being of her loved ones.

This affidavit indicates that despite the execution of the deed, the decedent intended to maintain the life estate in her residence and to transfer the home to defendant upon her death as part of an inheritance estate plan. This factor does not indicate an intent to defraud.

MCL 566.34(2)(c) addresses "[t]he transfer or obligation was disclosed or concealed." This factor does not favor an intent to defraud. The quitclaim deed was signed by the decedent on December 21, 2021, and it was notarized and recorded that same day. Thus, there was a public record of the quitclaim deed, evidencing the intent to transfer the decedent's interest to defendant when decedent died.

MCL 566.34(2)(d) states, "[b]efore the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit." This factor also does not reflect an actual intent to defraud. At the hearing on the renewed motion for summary disposition, defendant advised the court that the decedent regularly paid at least the minimum due on her bills. Defendant indicated that when the decedent became ill, defendant withdrew the funds to continue the payment of the decedent's bills. And, defendant recalled in her deposition testimony that the decedent advised that, upon her death, the decedent's debts "went with her" and defendant was not responsible. Defendant offered that the decedent regularly paid her bills before her death, and there was no indication that the decedent's creditors threatened to sue her.

MCL 566.34(2)(e) reads, "[t]he transfer was of substantially all of the debtor's assets." Arguably, this factor favors an intent to defraud because the home was the decedent's largest asset and had no encumbrances.

MCL 566.34(2)(f), "[t]he debtor absconded," does not favor an intent to defraud. The decedent executed the quitclaim deed in a public manner. An attorney prepared the quitclaim deed. It was not hidden in a drawer, but was executed, notarized, and recorded in the register of deeds on the same day. The decedent did not abscond after executing the quitclaim deed and continued to reside in her home.

MCL 566.34(2)(g) also does not reflect an intent to defraud ("The debtor removed or concealed assets."). There is no indication that the decedent removed or concealed assets.

MCL 566.34(2)(h) addresses, "[t]he value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred." This factor favors finding an intent to defraud. Indeed, defendant admitted that she did not give any consideration to the decedent in exchange for executing the quitclaim deed. In her deposition, defendant testified that the decedent did not request any payment of money because it was gifted to her.

MCL 566.34(2)(i) favors a finding of intent to defraud when "[t]he debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred." MCL 566.32 addresses "insolvency" and provides:

-12-

(1) A debtor is insolvent if, at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets.

(2) A debtor that is generally not paying the debtor's debts as they become due other than as a result of a bona fide dispute is presumed to be insolvent. The presumption imposes on the party against which the presumption is directed the burden of proving that the nonexistence of insolvency is more probable than its existence.

(3) As used in this section:

(a) Assets do not include property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable under this act.

(b) Debts do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset.

Plaintiff contends that the execution of the quitclaim deed caused the decedent to become insolvent. However, plaintiff failed to provide an affidavit delineating the decedent's debts at the time of the deed's execution, the monthly payment that each creditor required, the decedent's income from her job at Target, and any other income or monetary accounts that the decedent had. We conclude that plaintiff's affidavit that "large" debts were due is insufficient to determine that the decedent was rendered insolvent when her income earnings, any savings, any checking, and any other assets were not delineated by plaintiff. Specifically, plaintiff, the moving party, must support his claim for summary disposition by affidavits, depositions, admissions, or other documentary evidence. *McCoig Materials, LLC v Galui Constr, Inc*, 295 Mich App 684, 693; 818 NW2d 410 (2012). Once satisfied, the burden shifts to the nonmoving party to establish that a genuine issue of material fact exists for trial. *Id*. "The nonmoving party may not rely on mere allegations or denials in the pleadings." *Id*. Without providing an assessment of plaintiff's income, encumbrances (such as utilities), debts, and bank accounts, it cannot be concluded that the decedent became insolvent by merely executing the Lady Bird deed. MCL 566.32(1).

Moreover, the decedent as the grantor of the Lady Bird deed "retained the right to sell, commit waste, and do almost anything else." *Bill & Dena Brown Trust*, 312 Mich App at 687 n 2. Because the decedent retained the right to sell, plaintiff failed to show that the execution of the Lady Bird deed rendered the decedent insolvent. The execution of the deed did not immediately transfer the residence to defendant. Rather, the decedent retained a life estate, and only upon her death, did the interest transfer to defendant. The mere execution of the deed did not render the decedent insolvent because of the decedent's ability to exercise rights over the property, including acts such as a sale or the commission of waste. *Id*.

And, plaintiff failed to show that the decedent was rendered insolvent under MCL 566.32(2) ("A debtor that is generally not paying the debtor's debts as they become due other than as a result of a bona fide dispute is presumed to be insolvent."). At the dispositive motion hearing, defendant represented that the decedent made the monthly payments. Again, plaintiff failed to present evidence of the decedent's credit limit, when the debt was incurred, the monthly

payments, and the decedent's payment history.[4]  Thus, this factor does not demonstrate intent to defraud.

MCL 566.34(2)(j) demonstrates an actual intent to defraud when "[t]he transfer occurred shortly before or shortly after a substantial debt was incurred."  Again, plaintiff, as the moving party, was required to make and support entitlement to summary disposition.  Defendant asserted that the decedent had credit card debt, but made her monthly payments and intended to continue making those payments when she became ill and died suddenly.  Because plaintiff failed to support this factor with documentary evidence, this factor does not demonstrate an intent to defraud.

Finally, MCL 566.34(2)(k) provides "[t]he debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor."  This factor does not apply because this case does not involve a business, but a residence.

MCL 566.34(3) provides that the creditor had the burden of demonstrating the claim of actual intent to defraud by a preponderance of the evidence.  Of the factors, plaintiff only made a showing of fraud pertaining to MCL 566.34(2)(a), (e), and (h).  More importantly, defendant testified that she was the youngest sibling and only child of decedent without a home.  Defendant lived her entire life in the decedent's home and decedent gifted the home to defendant as an inheritance to prevent her from becoming homeless.  Defendant averred in an affidavit that there was no intent to defraud; rather, the Lady Bird deed was used to pass property to defendant at the decedent's death.  Because plaintiff did not meet his burden of proof pertaining to actual intent to defraud under MCL 566.34(2), we conclude that the trial court properly granted summary disposition to defendant under MCR 2.116(I)(2) of plaintiff's MUVTA claim.

Alternatively, plaintiff alleged that a voidable transfer was established under MCL 566.35(1):

> A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Under MCL 566.35(1), the decedent had to incur the debt before the execution of the Lady Bird deed, the decedent did not receive reasonably equivalent value, and the debtor was insolvent at the time of the deed execution or became insolvent as a result of the transfer.

---

[4] Additionally, plaintiff did not present evidence of the decedent's credit applications.  It is unknown when the decedent was issued these credit cards, whether she was a homeowner at the time of issuance, and whether the credit card companies merely relied on the decedent's income at the time the credit cards were issued.

Plaintiff submitted an affidavit that provided, in pertinent part:

5.   The following creditors, which are collectively owed $32,405.17, have filed claims against [the decedent's estate]:

A.  Citibank, in the amount of $6,195.37;

B.  TD Bank USA – Target Visa credit card, in the amount of $3,605.40;

C.  DFCU Financial, in the amount of $12,691.22;

D.  Meijer MasterCard, in the amount of $1,029.91;

E.  Amazon Store credit card, in the amount of $393.00;

F.  JC Penney credit card, in the amount of $2,501.46;

G.  Comenity Capital Bank – Sephora credit card, in the amount of $812.07;

H.   Comenity Capital Bank – Victoria's Secret credit card, in the amount of $1,515.82, and,

I.  Care Credit, in the amount of $3,660.92.

6.  [The decedent's estate] is insolvent and does not have any assets other than this lawsuit to recover the fraudulent transfer of the home made by [the decedent] to [defendant]; a photocopy of the inventory of [the decedent's estate] is attached as Exhibit 1.

7.  [The decedent's estate] is insolvent and is unable to pay the administrative expenses of the Estate and the claims of creditors of the Estate.

Additionally, plaintiff submitted the affidavit of Jay Howard, a collections officer for DFCU Financial for 22 years.  This affidavit stated that when the decedent executed the quitclaim deed she owed DFCU Financial "a large MasterCard debt."  And after she passed away on June 22, 2022, the decedent "was still indebted to DFCU Financial on a large MasterCard debt."  In the seven months between the execution of the deed and death, the balance of the owed debt "did not change significantly."

Again, we conclude that plaintiff failed to meet his burden of proof.  Plaintiff did not present an affidavit delineating the debt amounts at the time of execution of the Lady Bird deed (i.e., show the debt existing at the time of the deed's execution).  And, he failed to show that the decedent became insolvent as a result of the transfer.  Specifically, he failed to provide an itemization of the decedent's income, bills, and any savings.  Further, the decedent's transfer did not eliminate her interest in the property.  She still retained a life estate in the property and could

still sell the property and commit waste. In light of the nature of the executed interest and the ability to sell the property, plaintiff failed to demonstrate insolvency under MCL 556.35(1).[5]

Affirmed.

/s/ Noah P. Hood
/s/ Thomas C. Cameron
/s/ Anica Letica

---

[5] We note that plaintiff cited a multitude of caselaw that referenced earlier statutory versions of MUVTA that were repealed, including MCL 566.12 and MCL 566.13, as well as a probate court decision that he contended was distinguishable and erroneous. Because those decisions predated the adoption of MUVTA and its statutory definitions, they are neither binding nor persuasive.